NEW-YORK,
May, 1819.

JACKSON
v.
COLE.

JACKSON, *ex dem.* OVERACKER AND OTHERS, *against* COLE
AND OTHERS.

THIS was an action of ejectment, in which the plaintiff claim edseven-eighths of a piece of land, containing about seventy acres, lying in lot No. 46. in the town of *Aurelius*, in the county of *Cayuga*, as being, in fact, part of the adjacent lot No. 37. to which the plaintiff claimed title, on the ground of a mistake in the original survey and location of these lots. The cause was tried before the late Chief Justice, at the *Cayuga* circuit, in *June*, 1818.

The plaintiffs produced in evidence a patent, dated the 24th of *September*, 1792, issued in pursuance of the act to carry into effect the concurrent resolutions and acts of the legislature, for granting certain lands, promised to be given as bounty land, by which patent there was granted to *George Weaver*, "All that certain tract or lot of land, situate, lying, and being in the county of *Montgomery*, and in the township of *Aurelius*, known and distinguished on a map of the said township, (filed by the surveyor general in the secretary's office, agreeable to law,) by lot No. 37. containing six hundred acres." The lessors of the plaintiff claimed under a deed from the patentee, but it is unnecessary to state their deduction of title.

It was proved that there had been a mistake in the original survey of the town of *Aurelius*, in running the line of the fourth and fifth tiers of lots; lot No. 37. being situated in the fourth, and No. 46. in the fifth tier. In *May*, 1802, the surveyor general caused a line to be run by one *Annin*, a surveyor, between those tiers of lots, in order to ascertain the existence and extent of the alleged mistake ; and it appeared, from a variety of testimony produced on the trial, that in consequence of this mistake, lot No. 37. fell considerably short of the quantity of 600 acres, and that there was an excess equal to that deficiency in lot No. 46. But as the deficiency of the former cannot be supplied out of the excess of the latter.

A sale, to defray the expenses of survey, of the fifty acres reserved, for that purpose, in a corner of each lot in the *military tract*, vests a complete title in the purchaser, which cannot be affected by showing that there was a mistake in the original survey, according to which patents were issued; and that those fifty acres ought to be added to an adjacent lot, in which there was a deficiency of land, in order to give it the full quantity of 600 acres. And *it seems*, that in all cases, the boundaries of lots in the *military tract*, depend upon the actual survey and location, and not on the description in the patent, and the map filed by the surveyor-general, in the office of the secretary of state: so that, if by an error in the actual location, one lot falls short of 600 acres, and an adjacent lot has an excess equal to the deficiency,

decision of the cause turned entirely upon a single question of law, it is not thought necessary to give a minute statement of the evidence, especially as it could not be rendered intelligible, without a reference to the maps.

The defendants produced in evidence a deed from *P. Van Cortlandt* to *N. Smith*, dated the 6th of *November*, 1794, for 50 acres, in the north east corner of lot No. 46. being the 50 acres set apart, according to law, for the expenses of the survey ; and showed a title in *Cole*, one of the defendants, under this deed.

A verdict was found for the plaintiff, subject to the opinion of the Court, on a case containing the facts above stated.

The case was very fully argued by *Sill* and *Talcot*, for the plaintiff, and by *Cady* and *Richardson*, for the defendants ; but as the Court gave their opinion merely on the question as to the *location* of the lot in which the premises were situated, without taking notice of the other points raised, it is deemed unnecessary to state the arguments of counsel.

The plaintiff's counsel cited *Jackson, ex dem. Crosset,* v. *Hunter*, (1 *Johns. Rep.* 495.) *Jackson, ex dem. Wickham,* v. *Belknap*, (12 *Johns. Rep.* 96.) *M'Iver's Lessee* v. *Walker*, (9 *Cranch*, 173.) 2 *Caines' Rep.* 146, 147. 1 *Caines' Rep.* 362. 2 *Johns. Cases*, 354. 15 *Johns. Rep.* 264.

SPENCER, Ch. J. delivered the opinion of the court. The lessors of the plaintiff claim title to seven-eighths of the premises in the possession of the defendants, respectively, as part of lot No. 37. in *Aurelius ;* and the defendants, independently of objections to the plaintiff's deduction of title, insist, that the premises are part of lot No. 46. in the same town.

In deciding this case, we do not deem it necessary to examine, or decide, the several questions made as to the deduction of title by the lessors of the plaintiff, but we proceed entirely on the location of the lots.

In the patents for the military lots, they are described as

known and distinguished on a map of the towns, filed by the surveyor general, in the secretary's office, by a particular number, and as containing six hundred acres ; and the patent for lot No. 37. was issued in that form. It is contended, on the part of the plaintiff, that the map being referred to by the patent, and it representing this lot as a square containing 600 acres, the plaintiff is entitled to that quantity ; and that in the present case, it appearing that this lot falls short of that quantity, and lot No. 46. having a surplus quantity, equal to the deficiency of lot No. 37. a mistake has happened in the original survey of the lots, which mistake has been corrected under the authority of the surveyor general, and that the plaintiff has a right to recover to the new line thus ascertained.

Whatever may be the equity and justice of this claim, as between the original patentees, we can only consider what are the legal rights of the parties.

The letters patent were issued in such form as the commissioners of the land office saw fit to adopt. In giving a construction to the patents thus issued, we must refer to the acts of the legislature, which authorized the commissioners to act ; and to arrive at the intention of the legislature, we must regard all the provisions contained in the statute, and the sense and import of the letters patent.

These patents were issued under the act of the 6th of *April*, 1790, entitled, " An act to carry into effect the concurrent resolutions and acts of the legislature, for granting certain lands, promised to be given as bounty lands, and for other purposes therein mentioned." (2 *Greenleaf's* ed. of *Laws*, 332.) The 3d section of the act made it the duty of the surveyer general to sub-divide the townships, the exterior lines of some of which had been before run out, into one hundred lots, each of which was to contain 600 acres. The 4th section of the act subjects 50 acres, in one of the corners of the respective lots, to the payment of six dollars to the surveyor general, for his services and expenses in marking, numbering, and surveying the lots ; and he is authorized and required, if that sum shall remain unpaid for two years after the patents are issued, to sell 50 acres of each lot, and the purchaser is declared to be vested, in consequence of

NEW-YORK,
May, 1819.

JACKSON
v.
COLE.

such sale, with the fee of the land so to be sold. The 6th section of the act directs the commissioners of the land-office, previous to issuing the patents, to draw, by lot, from ballots or tickets to be prepared by them, numbers, designating lots for such persons as should be determined on by them, as entitled to bounty lands. It fully appears, that the premises are part of lot No. 46. as originally surveyed, and numbered, and marked.

The map, necessarily, represents the lots as of equal size, each containing 600 acres, and it shows their relative locality; but it furnishes nothing whereby the individual lots can be ascertained on the land, short of a survey of all the lots, on which the location of any particular lot depends. The legislature never intended to leave the patentees in that situation; and in directing the surveyor general to subdivide the townships into lots of 600 acres each, they intended that the lots should be practically located, by marking and numbering them, in such a manner that the patentees could, with the aid of the map, ascertain their individual lots; and it must have been contemplated by the legislature, that field books of the survey of the lots would accompany the map.

If we regard the map alone, in giving location to the lots, all that part of the statute is disregarded, which required the towns to be practically subdivided into lots; and in all cases, the lines of lots, and the marking and numbering the corners, goes for nothing, if there be an excess or deficiency in quantity in any of the lots, however small the difference may be. To carry into effect the intention of the legislature, the lots must be located in reference to the authority and provisions of the statute under which the letters patent were issued; and although the patents have no reference to the actual survey and location of the lots, yet, as the legislature made the survey, and marking and numbering the lots, a pre-requisite to the issuing the patents, the actual survey must be deemed part and parcel of the description.

The military lots were a gratuity from the state for meritorious services of the highest order; the legislature had the right, as donors, to prescribe the conditions of the gift. The letters patent could mislead no one. The title is pri-

marily derived from the act of the legislature, and the com-
missioners of the land office are the public functionaries to
carry into execution the legislative will.   The act, there-
fore, being the basis of title, in giving a construction to the
patents, and in settling the location of the lots, the statute
is to be resorted to, as furnishing the evidence of the in-
tention of the legislature, how the lots were to be located.
We are, then, to read the patent under which the plaintiff
derives title, as referring to the field book, and survey and
subdivision of the lots made by the surveyor general and his
agents : and then the case of *Mann* v. *Pierson*, (2 *Johns.
Rep.* 37.) applies, that the mention of the quantity of acres
contained in the lot is matter of description only.   This is
not construing the patent by any thing *dehors* the grant, but
by facts and provisions, although not expressed, necessa-
rily implied.   It seems to be beyond all doubt, that had the
patent referred to the survey of the town, and the subdivi-
sion of the same into lots, agreeably to the field book made
and returned, the actual survey must have controled the
location of the lots.   The patents having been issued ex-
pressly under the authority of the act, the form of descrip-
tion used by the commissioners is not to supersede the
enactments and requisitions of the legislature.   The several
lots, though apparently on the map of equal size, and con-
taining 600 acres, were known only as lots, by the actual
marking and numbering them on the ground.

The reservation of 50 acres in one of the corners of the
respective lots, and subjecting them to sale, if the sum of six
dollars for marking, numbering, and surveying each lot, re-
mained unpaid, for two years after issuing the respective
patents, and the provision that the purchaser shall be vested
with the fee of the lands so to be sold, clearly shows that the
legislature meant, that the subdivision of the lots by the sur-
veyor general, or his agents, should definitively fix their loca-
tion.   The 50 acres thus set apart, are to be " in one of
the corners of the respective lots so laid out ;" and, it ap-
pears, in this case, that *Smith*, when he first entered into
possession, went into the occupation of 50 acres in the
*north east* corner of lot No. 46. under a purchase of the same
from *Van Cortlandt*, and these 50 acres were sold as part

and parcel of lot No. 46. for the expense of the survey. It cannot, we think, be controverted, that the purchasers of the 50 acres, so subjected to sale, for the non-payment of the expenses of the survey, have gained a complete title, according to the actual location of the lots, on the survey, marking, and numbering thereof. They have purchased 50 acres in one of the corners of the lots so laid out ; they have purchased a specific, ascertained quantity, founded on the marking, numbering, and surveying of each lot ; and the act expressly vests them with the fee of the lands so sold. It would be nugatory to say to such a purchaser, " true, you have bought 50 acres in one of the corners of the lots, which had been marked and numbered, but a mistake has occurred in running out the lot." His answer would be decisive, that he purchased upon the faith of the statute ; and that the government, through its agent, had surveyed out, marked, and numbered the lots, and that he had acquired a perfect title to an ascertained and definite 50 acres, in one of the corners of the lot. If the boundaries of the 50 acres in the corners of each lot are thus fixed, as regards the purchaser of that parcel, the boundaries of the whole lot are definitively settled, throughout, as regards the patentees, and those claiming under them.

The sixth section of the act confirms the construction already given : It directs the commissioners of the land office to provide one hundred ballots, or tickets, for each township, numbered from number one progressively ; that the ballots shall be put into a box, and whenever they shall have determined that any particular person applying for bounty or gratuity land is entitled to the same, they shall cause one ballot or ticket to be drawn out of the box ; and it provides, " that the lots in each township, so drawn, shall be the separate and distinct share of such person, or of his heirs and assigns."

What constituted the parcels of land, thus set apart, lots, but the subdivision of the townships, by surveying, marking, and numbering them on the ground ? The letters patent founded on the drawing of the ballots, gave the grantees a right to patents for the lots corresponding with the numbers drawn.

If any of the lots contain a less quantity of land than that promised to be given, recourse must be had to the government alone. It is in vain to allege, that the lines of the lot were run without the consent or concurrence of the grantees. It depended altogether on the munificence of the government what they would give, and in what manner it should be given, and how the thing given should be ascertained. This case cannot justly or aptly be compared to a case between individuals, founded on a contract ; for here the donation is gratuitous.

It cannot be denied, that in the case of *Jackson* v. *Hunter*, (1 *Johns. Rep.* 495.) this Court expressed an opinion, that as a mistake had occurred in running the line dividing the lots, and as the map filed in the office of the secretary of state, and referred to in the patent, was correct and agreeable to law, and that as the deputy surveyor was appointed without the consent of the parties, and as nothing had been done to conclude the rights of the plaintiff to have the mistake corrected, the plaintiff was entitled to judgment.

I am free to declare, that upon further consideration, I am satisfied that the opinion delivered in *Jackson* v. *Hunter* cannot be supported ; and that it was founded upon too narrow a view of the act. I am not authorized to say that my brethren fully and explicitly renounce the opinion delivered in *Jackson* v. *Hunter*, though I understand them to incline to consider it incorrect. They do not consider this case as requiring them expressly to overrule that case. We all concur in the opinion, that the sale of 50 acres in the *north east* corner of lot No. 46. gave the purchaser a full and complete title to the 50 acres, as actually located, as part and parcel of lot No. 46., and that the *north east* corner of the 50 acre lot is to be considered the *north east* corner of lot No. 46. as regards all parties interested in the two lots, Nos. 37. and 46. ; and that the lines of lot No. 46. must conform, *in toto*, to that location. We are, also, of opinion, that the acts of the parties in this case, if it was necessary to have recourse to them, have definitively fixed the boundary line between lots No. 37 and No. 46. as held and contended for by the defendants.

NEW-YORK,
May, 1819.

I must be allowed to say, that it was not to have been expected, from the nature of the case, that there would have been entire accuracy in the subdivision of these lots; and when we consider that the country was a wilderness, presenting many impediments to perfect precision, all that could have been intended by the legislature was, that the survey should be performed with good faith. The government might have taken the precaution to have had the surveys re-examined, before letters patent issued; but after patents have issued, and after such long acquiescence, it is now too late to attempt to correct mistakes. If the corners of the lots, as fixed by the surveyor general originally, are now to be disregarded, it is not too much to say, that almost every lot in the military tract will be thrown into confusion, and become the source of controversy.

With respect to the re survey made by *Annin,* in 1802, under the directions of the surveyor general, it was an unauthorized act. The surveyor general had, long before that period, executed the powers vested in him. He was *functus officio ;* and *Annin's* acts were those of a private individual.

Judgment for the defendants.